UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

STEWART J. RODAL,

                          Plaintiff,

     v.                                                       00-CV-1386

ANESTHESIA GROUP OF
CENTRAL NEW YORK,

                          Defendant,
_____

APPEARANCES:                            OF COUNSEL:

STEWART L. WEISMAN, ESQ.
Attorney for Plaintiff
8060 Shadow Rock, Box598
Manlius, NY 13104-0598

SCOLARO, SHULMAN, COHEN,        SHARI R. COHEN, ESQ.
FETTER & BURSTEIN, P.C.
Attorneys for Defendant
Franklin Square
507 Plum Street. Suite 300
Syracuse, NY 13204

HOWARD G. MUNSON, SR. J.

**MEMORANDUM DECISION AND ORDER**

**BACKGROUND**

In a Memorandum Decision and Order dated May 18, 2003, this court granted summary judgment in favor of defendant Anesthesia Group of Onondaga, P.C., ("the Group") and against plaintiff Stewart J. Rodal. The complaint alleges violations of the American with Disabilities Act, 42 U.S.C. §12101, *et seq.* ("the ADA"), supplemental jurisdiction is also invoked under

28 U.S.C. § 1367.

Plaintiff appealed this result, and in <u>Rodal v. Anesthesia Group of Onondaga, P.C.</u>, 369 F.3d 113 (2d Cir. 2004), the Second Circuit Court of Appeals reversed the decision and remanded the case to this court for further proceedings consistent with its opinion, including further consideration of Dr. Rodal's status as a group employee in light of the Supreme Court's decision in <u>Clackamas Gastroenterology Associates, P.C. v. Wells</u>, 538 U.S. 440, 123 S. Ct. 1673, 155 L. Ed.2d 615 (2003).  The opinion further advised, that on remand, the district court may reopen discovery or take whatever steps it deems appropriate to determine this issue.

Plaintiff is an anesthesiologist.  Defendant is a professional corporation which provides anesthesia services and which consists of  shareholder-employees, all of whom are anesthesiologists, and other non-shareholder-employees, consisting of both doctors and other staff.

At issue in <u>Clackamas</u> was whether four physicians actively engaged in medical practice as shareholders and directors of a professional corporation were employees under the Americans with Disabilities Act, which employs the same definition of employee as Title VII and similarly limits its applicability to employers with 15 or more employees.  Currently pending before the court, is defendant's supplemental motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Plaintiff has enter opposition thereto.   After a conference with the respective parties, the court ruled in its order of July 8, 2005,  that the extensive discovery that had taken place in this case prior to defendant's first summary judgment motion had adequately covered the subject  matter required for ascertaining plaintiff's employment status in defendant's renewed summary judgment motion. Therefore, reopening discovery in this

case was unnecessary.

## DISCUSSION

The standard for summary judgment is well defined. "Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As a general rule, all ambiguities and inferences drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party. However, "where the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim." Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir.1991). In order to obtain summary judgment relief, the moving party need not prove that his opponent's case is wholly frivolous. When a defendant has moved for summary judgment on the ground that undisputed facts reveal that the plaintiff cannot establish an essential element of the claim, on which element the plaintiff has the burden of proof, and the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on that element, summary judgment should be granted. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S.Ct. 2505, 2510, 91 L. Ed.2d.2d 202 (1986). If the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements of the claim become immaterial and cannot defeat a motion for summary judgment. Celotex Corp. v. Catrett, 477 U.S. at 322-23, 106 S. Ct. at 2552; Knight v. U.S. Fire Insurance Co., 804 F.2d

9, 11-12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S. Ct. 1570, 94 L .Ed.2d 762 (1987); Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir.1985) (*per curiam*); Duse v. International Business Machine Corporation, 252 F.3d 141, 158 (2d Cir. 2001).

After acknowledging that there was no such thing as a "professional corporation" at common law, the Supreme Court concluded that "the common law's definition of the master-servant relationship does provide helpful guidance." Clackamas, 538 U.S. at 448, 123 S. Ct. at 1679. The Court determined that "the common-law element of control is the principal guidepost that should be followed[.]" Id.

The Supreme Court held that each of the following six factors, drawn from the Equal Employment Opportunity Commission Compliance Manual, is relevant:

Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work,

Whether and, if so, to what extent the organization supervises the individual's work,

Whether the individual reports to someone higher in the organization,

Whether and, if so, to what extent the individual is able to influence the organization,

Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts,

Whether the individual shares in the profits, losses, and liabilities of the organization.

Id. at 1680 (quoting 2 Equal Employment Opportunity Commission, Compliance  Manual § 605:0009 (2000)).  Id.

The Court made clear that the six-factor list is not exhaustive and that courts should take into consideration all incidents of the employment relationship. Moreover, no one factor, such

as the individual's title or the terms of any written contract, is decisive. The answer to whether a shareholder/director is an employee or an employer cannot be decided in every case by a " 'shorthand formula or magic phrase.' " Nationwide Mutual Insurance Co. v. Darden, 503 U.S. 318, 324, 112 S. Ct. 1344, 117 L. Ed.2d 581 (1992) (quoting, 390 U.S. 254, 258, 88 S Ct. 988, 19 L. Ed.2d 1083 (1968)).

The six factors were selected because they provided guidance in resolving the more general issue of whether an individual "is an employee or, alternatively, the kind of person that the common law would consider an employer." Id. at 445 n. 5, 123 S. Ct.1673. Indeed, the source of the factors--an EEOC compliance manual--identifies them as relevant to whether "partners, officers, members of boards of directors, and major shareholders qualify as employees." Id. at 449, 123 S. Ct. 1673 (citing 2 EEOC Compliance Manual §§ 605:0008-605:00010 (2000)).

Each of the parties in this litigation discusses the six factors stated above seriatim.

1) <u>Whether the organization can hire and fire the individual or set the rules and regulations of the individual's work</u>:

Concerning the first Clackamas criterion, plaintiff states in his affidavit that he was an employee of the Group under the terms of a written Employment Agreement (Ascioti Aff. Ex. A) whereby the Group determined what patients he treated, the rules and conditions governing under which those services were to be performed, and the fact that his employment could be terminated in several ways.

The affidavits of the Group's President, Anthony A. Ascioti, M.D., avers that it is undisputed that plaintiff's Employment Agreement was identical to all those of the

5

shareholder/directors including himself, and its terms include time and location of work assignments, working conditions, and grounds for termination. The Group could no more hire and fire plaintiff in the usual sense or set rules and regulations for his work, than it could for any other shareholder/director. He was substantially independent in his own professional duties, plaintiff and his fellow physicians in the Group were co-equals within their practice, and plaintiff did not report to any member of the organization, but, rather, to the Group itself.

(2) <u>Whether and, if so, to what extent the organization supervises the individual's work</u>:

Plaintiff states that the Group had a daily supervisor called the OR Coordinator, who made all of the decisions regarding operating room and work assignments, designated doctors to give lunch breaks to other doctors, and decided when the doctors' work day ended. These rules were to be followed by all doctors in the work areas. Without the OR's approval, a doctor could not alter his hours, patients room assignments or work area as a business owner could for personal needs.

The post of OR Coordinator was rotated among the shareholder/directors, and from the shareholder/track employees who had not yet attained ownership in the Group. Plaintiff had no control as to the creation of the OR Coordinator position, its duties and powers, and his responsibility to comply with the OR Coordinator's scheduling of hours, patients, room assignments, or work area. He also had to report to non-shareholders. Plaintiff "was not free to nor could [he] change, without permission from the coordinator, his hours patients, room assignments, or work area . . . ." (Rodal Aff. opposing supplemental summary judgment ¶ 9).

The Group replies that the OR Coordinator was a scheduling supervisor, and did not supervise the Group members' work *per se.* Assignment to this position was rotated each day,

and was often changed by Group members, as was their position on the call schedule. Exhibit A of Dr. Ascioti's Reply Affidavit contains copies of 45 pages of Call Schedules showing myriad hand written changes made by Group members. The members made changes in calls, vacations and the OR Coordinator position itself, which were not initialed by the OR Coordinator because the coordinator's permission was not required to make these changes.

These changes are permitted so the Group members may accommodate each other. In ¶ 70 of his affidavit opposing the initial summary judgment motion in this case, plaintiff claims that the Group members always had differences, plaintiff cites as an example the deposition testimony of former shareholder/director John Sacco M.D. that "the members of our group, despite all their differences, and despite all our arguments and dissimilarities . . . ." In reality, if plaintiff had quoted Dr. Sacco's complete statement, it would paint an entirely different picture, and demonstrates why the Group was so flexible about making these accommodations. The full statement reads:

> Well, the members of our group, despite all our arguments and dissimilarities, the members of our group have always been and will always be loyal brothers to one another, and there is no way that any member, or group of any guys in our group would force out another member of our group, and it really hurts to have a former member, despite the differences we may have had, bring up allegations such as this that are more than hurtful and more than disappointing, and I don't think I'll ever get over it.   (Sacco Dep. p. 42, Ascoti Reply Aff., Ex. B).

Plaintiff states in ¶ 10 of his Affidavit in Opposition, "I had no control as to the creation of the OR Coordinator position, the duties and powers of the coordinator, and my obligation to

comply with the coordinator's scheduling of my hours, patients, assignments, or work area." While he may not have created the OR Coordinator position, during his October 2, 2001 deposition, plaintiff gave extensive testimony concerning his "computerition of the Group's rotating" call system. He stated that he programmed the computer to make certain special assignments, including that of coordinator, for the purpose of making the rotations "equal." In fact, in the lower right hand corner of each page of the Call Schedule form has plaintiff's name printed thereon as its creator.

3) <u>Whether the individual reports to some one higher in the organization</u>:

 Plaintiff states that he reported to the Board and the OR Coordinator, but fundamental issues such as being admitted into the Group, filing for disability and seeking disability accommodation would be addressed by the Group President. The President also sets the agenda and conducted the Group's board meetings. (Rodal Aff. ¶ 11).

 The Group responds that plaintiff did not report to any individual or organization but to the Group itself. As previously discussed above, the OR Coordinator's scheduling position was rotated daily, and was not a higher position in the Group. Even though the Group President may have been technically higher in the Group than plaintiff, plaintiff did not report to him. The matters plaintiff brought to his attention, and his Board meetings duties were routine administrative functions of the President's office.

4) <u>Whether and to what extent the individual is able to influence the organization</u>:

 Plaintiff claims that he had no more influence on the organization than any other member of the Group. He does not say that he was unproductive in carrying out the various projects he undertook on the Group's behalf, however, effective work accomplishments differ from

influencing an entire organization, as can be seen during his request for accommodation in 1995. (Rodal Aff. ¶ 12).

The Group counters that plaintiff's statement is not borne out by the evidence in this lawsuit. In his §§ 16-18 of his verified complaint, plaintiff maintains that, in addition to his medical duties, he oversaw the residency program, coordinated the Group's educational program, represented the Group at several national program director meetings, developed custom modifications to monitoring equipment that eventually became standard hospital fare, computerized the Group's "intricate rotating" night call system, programmed a hand held programmable calculator to do physiologic analysis, brought bookkeeping in house, created, maintained and supervised the Group's business office, which included finding and purchasing the billing system, mastering it, custom configuring the files, writing a computer program to provide standardized letters to answer billing questions, overseeing of ancillary equipment such as paper handlers, mailing systems and microfilm data storage systems, and the collection of delinquent accounts.

In 1995, during his period of accommodation, he worked in the North Medical Center outpatient center, which " placed [him] across the hall from the billing office allowing [him] to continue to oversee the operation" (Verified Complaint § 20). In a letter to Group President Dr. Ascioti dated September 25, 1995, plaintiff wrote, "for many years now I have been responsible for much of the internal business dealings of the Anesthesia Group," and lists his many supervisory responsibilities. (Cohen Reply Aff. Ex. I). In §§ 43-47 of his affidavit in opposition to the Group's first summary judgment motion, plaintiff describes his multiple managerial responsibilities. (Id. Aff, Ex. A).

In the course of his deposition testimony, plaintiff declared that he served as an administrator in both the Group and in St. Joseph's Department of Anesthesia, and, together with other shareholders, he could hire individuals to staff the facilities for which the Group provided anesthesia services, (Id., Ex. F, p 87, 104), where he worked as a practice administrator "During [his] entire time at Anesthesia Group," (Id, Ex. F p. 113) he drafted changes in employee compensation and benefits packages and worked with the Group's attorney in revising and drafting the Group's agreements (Id., Ex. p. 114), he was "frequently involved" in the job requirements of the Group's non-physical employees (Id. Ex. J p. 13), was the "driving force" in structuring the Group's fees (Id. Ex. J p. 18), he was responsible for assessing the new computer system for the pain management office (Id. Ex. J p. 22), he worked independently with Blue Cross/Blue Shield on behalf of the Group (Id. Ex. J p. 24), and his "very critical involvement in negotiating the Group's reimbursement rates (Id. Ex. J p. 25-26). There is not a threshold level of influence that is required in order to satisfy the Clackamas test. In the instant case, it is clear that plaintiff had significant influence on the operation of the Group, supporting the conclusion that he was not an employee.

5) <u>Whether the parties intended that the individual be an employee as expressed in written agreements or contracts</u>:

While plaintiff has placed much reliance in the terms of the Employment Agreement he signed with the Group to show that he was an employee, the Supreme Court has cautioned that the mere existence and terms of a document styled employment agreement should not lead inexorably to the conclusion that either party is an employee. Clackamas, 538 U.S. at 450, 123 S. Ct. 1673.

In determining whether the Group's shareholder/directors are employees for purposes of the ADA, consideration must be given to all components material to the applicable relationship and the economic reality of the Group's existence and operations.

Employment agreements do not obviate the manner in which the shareholders actually functioned. Those entered into by the shareholder/directors contemplated full time engagement in the practice of anesthesiology and provide for compensation as determined by a board comprised of all the shareholder/directors. The Group's members share ownership. The compensation of shareholder/directors is not tied to their performance and indeed no shareholder is evaluated or supervised by any one person, but by the Group itself. Each shareholder/director receives compensation based on the Group's profits. The Group's members are limited to licensed anesthesiologists, who are liable for their acts of professional negligence, and for those of persons acting under their supervision. The Group's members may have executed Employment Agreements, but plaintiff has referred to the other shareholder/directors as "my partners." (Rodal, Dep. p. 23; Cohen Reply Aff., Ex. F).

6) <u>Whether the individual shares in the profits, loses and liabilities of the organization:</u>

The Employment Agreement provides for "at a mutually agreed upon salary," (Ascoti Aff. B, ¶2). Salary was determined by equally dividing and distributing the Group's profits, losses and liabilities pursuant to a written Agreement Concerning Allocation of Net Profits. There is no dispute that plaintiff signed this agreement, and shared in its benefits.

Plaintiff and all other shareholders were entitled to a percentage of the Group's accounts receivable in the event of termination of employment as a result of death, disability or retirement, pursuant to the Group's Supplemental Retirement Employment Agreement (SREA),

which plaintiff helped create. The Group's Employment Agreement deviated from the Employment Agreement of non-shareholder physicians/employees, whose salaries are fixed and could be adjusted at the sole discretion of the Group.

The court notes that plaintiff raises a claim here that in October 1999, the Group denied his request not to deduct the ninety days of disability income he had received from his partnership-buy out. The request was denied based on the Group's SREA, which provided that the amount of his partnership buyout would be reduced by the aggregate amount of disability paid or payable to plaintiff. He then instituted arbitration proceedings, and even though plaintiff had drafted and revised the SREA with the Group's attorney, plaintiff testified at the hearing that he had forgotten about that provision, and when he realized that the ninety days of disability income would be deducted from his buyout, he "thought it was unfair." The Arbitrator denied plaintiff's claim, concluding that a physician-director who made no contribution to the income of the Group was not entitled to share in the distribution of its profits. (Cohen Reply Aff., Exhibits A, F, C, D,).

## CONCLUSION

It is apparent from the record presented that the Group's shareholder/directors manage, control and run their firm. They were compensated based on profits, shared responsibility for expenses and liabilities, participated in management decisions and set policy. These indicia of management and ownership suggest that the shareholder/directors should not be counted as employees. The mere fact that the shareholder/directors were called "employees" in their Employment Agreements does not address the relevant issue here--how the business was actually run. On that issue, the Group has presented undisputed evidence that the shareholder/

directors actively carried out the Group's business concerns. On balance, the evidence supports only the conclusion that the doctor/shareholders are essentially "partners" and, therefore, are not employees of the firm.

Consequently, because plaintiff did not established the essential element of his claim, that he was am employee of the Group for purposes of the ADA, summary judgment in favor of the defendant Group is appropriate.

Because plaintiff's federal claim is dismissed, pendent jurisdiction will not be exercised over his state common law claims.  Although a court's exercise of pendant jurisdiction is discretionary, "a court should decline to exercise jurisdiction over state-law claims when it dismisses the federal claims prior to trial." Pitchell v. Callan, 13 F.3d 545, 549 (2d Cir.1994) (citing Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350, 108 S. Ct. 614, 98 L. Ed.2d 720 (1988)); Ahmed v. Trupin, 781 F. Supp. 1017, 1026 (S.D.N.Y.1992).

Accordingly, the Group's supplementary summary judgment motion is **GRANTED,** with prejudice to plaintiff's claims under the ADA, and the complaint is **DISMISSED**; plaintiff's state law claims are **DISMISSED** without prejudice.

**IT IS SO ORDERED**.

Dated: January  23 , 2006
Syracuse, New York

*/s/ Howard G. Munson*
Howard G. Munson
Senior U.S. District Judge